Decrees affirmed, and appeals dismissed at the costs of the appellants.

## Appeal of Alden et al.
## Appeal of Ferguson et al., Executors. 1.
## Appeal of Ferguson et al., Executors. 2.
## Appeal of Brooke et al., Executors.
## Appeal of White et al., Executors.

1, In 1786 Peter Grubb conveyed to Robert Coleman, Sr., an undivided one-sixth part of the Cornwall ore banks. The deed contained the following reservation: "saving and reserving unto the said Peter Grubb, the grantor, his heirs and assigns for ever, the right, liberty and privilege at all times hereafter of entering upon the premises hereby granted and released with his and their horses, carts, carriages and servants, and of digging, raising and hauling away a sufficient quantity of iron ore for the supply of any one furnace at the election of the said Peter Grubb, his heirs or assigns, at all times hereafter." It was claimed that under this reservation the grantor or his assignees were only entitled to a sufficient quantity of ore to supply a furnace such as was known in Pennsylvania at the time the deed was executed, and a bill in equity was filed for an account of the ore taken in excess of that quantity. *Held,* that a court of equity had jurisdiction of the bill and could grant relief. *Held, further,* that this reservation carried with it the right to enough ore to supply a furnace with all the modern improvements to be selected by the grantor or his assignees, and that the right to select was not exhausted by its exercise in a single instance.

2. The measure of the quantity of the ore was so much ore and no more, that a given furnace would use in the course of a year, taking into consider-

[Alden's Appeal.]

ation the wear and tear, and the necessity of its going out of blast for repairs at stated intervals.

3. The ore when taken from the mine was the absolute property of the defendants, and they had the right to use or sell it, provided the quantity thus used or sold did not exceed the quantity measured by the capacity of one furnace.

4. If defendants omitted to take the ore to which they were entitled in any one year they could not take the quantity thus omitted in any succeeding year.

5. Interest was chargeable on the ore taken or sold in excess of that needed for one furnace.

6. It was too late for executors to set up the Statute of Limitations who neither made suggestion thereof when they were made parties to a bill in equity, six years after their testator's death, nor six years thereafter when they filed an amended bill.

7. Grubb's Appeal, 9 Norris 228, distinguished.

February 16th and 17th 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON and TRUNKEY, JJ. STERRETT and GREEN, JJ., absent.

Appeals from the Court of Common Pleas, No. 4, of *Philadelphia county*: Of July Term 1878, Nos. 102, 109, 110, 111 and 112. In Equity.

Appeal of Anne C. Alden, Margaret C. Freeman and ' Sarah H. Coleman; of A. Wilhelm, surviving administrator *de bonis non* of Robert W. Coleman, deceased; of Anna C. Coleman, by her guardian Samuel Small; of Robert H. Coleman; and of A. Wilhelm, surviving administrator *de bonis non* of William Coleman, deceased. No. 102.

Appeal of Nathaniel Ferguson and William R. White, Henry P. Borie and J. Henry Hentz, executors of William R. White, deceased. No. 109.

Appeal of Nathaniel Ferguson and William R. White, Henry P. Borie and J. Henry Hentz, executors of William R. White, deceased, and Sarah D. Robeson, executrix of Henry P. Robeson, deceased. No. 110.

Appeal of Edward Brooke, surviving executor of Clement Brooke, deceased, and Sarah D. Robeson, executrix of Henry P. Robeson, deceased. No. 111.

Appeal of William R. White, Henry P. Borie and J. Henry Hentz, executors of William R. White, deceased, and Sarah D. Robeson, executrix of Henry P. Robeson, deceased. No. 112.

These appeals were taken from a final decree of the court in a suit in equity, in which Robert and George Dawson Coleman were complainants, and Robert W. Coleman, William Coleman, Henry P. Robeson and Clement Brooke, were defendants.

During the progress of the cause all of the defendants to the original bill died, and their executors and devisees were brought in by supplemental bill.

[Alden's Appeal.]

The bill which was filed July 15th 1856, in the Supreme Court at Nisi Prius, set forth : That on the 9th of May 1786, Peter Grubb, Jr., conveyed to Robert Coleman, all his one undivided sixth part in the Cornwall Furnace estate, including as part thereof, one undivided sixth part of the Cornwall Ore Banks and Mine Hills, reserving unto himself, his heirs and assigns, the right at all times thereafter, of entering on the said premises and digging and haul ing away a sufficient quantity of iron ore for the supply of any one furnace, at the election of said Peter Grubb, Jr., his heirs or assigns, at all times thereafter.

That subsequently, the said Robert Coleman became the owner of four other undivided sixth parts of said Cornwall Ore Banks and Mine Hills, and that the said five undivided sixth parts of said ore banks—subject, as to one undivided sixth, to said reserva- tion—were vested in certain proportions in the complainants and the defendants, Robert W. and William Coleman. That in May 1788, the said Peter Grubb, Jr., conveyed all his estate in said reservation to George Ege, who owned the Reading Furnace estate ; and that the said George Ege, continued during his life to supply said furnace with ore taken from the said Cornwall ore banks, under said reservation ; and that during his lifetime, the said Ege did not use the ore taken under said reservation, for any other pur- pose than the supply of the said Reading furnace ; and that the said Ege, did thereby elect and determine the one furnace to be supplied under said reservation, from that time thenceforth for ever. That said Reading furnace was a cold blast charcoal furnace, requiring, when worked to its maximum capacity, fifty tons of ore per week—but using ordinarily much less. That it required two tons of Cornwall ore to make one ton of iron, and that the greatest capacity of furnaces built and worked by the best process then known was, as late as 1790, not more than twenty-nine tons of iron per week—and the average capacity not more than twenty tons of iron per week. That by improvements in the building and operating of furnaces, their capacity, when the bill was filed, was tenfold what it was in the year 1790. That the possible produc- tive power of furnaces, and their corresponding capacity for con- suming ore, is indefinite and unascertainable, but that the amount of ore required for their supply in the past or present is easily capable of ascertainment. That among the causes of the increased productive capacity are improved machinery, the introduction of the hot blast, and the use of anthracite coal as a fuel. That the first of these causes was gradual, the second was not invented till about the year 1830, and the third was first introduced in this country about the year 1839. That the legal effect of the reser- vation was to vest in said Peter Grubb, Jr., in fee simple, a right to dig, take and haul away, for the purpose of being converted into iron, such a quantity of iron ore as could be so converted by

[Alden's Appeal.]

one furnace, and that this quantity was to be determined by the capacity of one furnace then erected, or to be erected, and by said Peter Grubb, Jr., or by his heirs or assigns, elected or fixed upon as the furnace which should be supplied under said reservation, and that the quantity to be taken was at all times thereafter limited to the amount which by said furnace, at the time of said election, was capable of being converted into iron. That the defendants Brooke and Robeson own the Reading furnace, and the ore-right reserved in the deed of May 9th 1786, and that they have in their possession and control the books and accounts of said furnace from 1788 to the date of the filing of the bill, and that said books and papers will show what was the quantity of ore which has been used from the Cornwall ore banks for the supply of said furnace, under said reservation, and that said books and papers will show the extent of the right reserved, as ascertained and fixed by the election of the said George Ege, and by user from that time until the defendants Brooke and Robeson became the owners of the same. That the said Reading furnace was not, until the year 1845, capable of using more than two thousand tons of ore annually, but that in that year the defendants Brooke and Robeson pulled down the old Reading furnace, and in its place erected a new furnace, of larger dimensions, and with new appliances, wholly unknown until years after said reservation was made, by means whereof the capacity of the present Reading furnace has been made one hundred and sixty tons of ore per week. That since the erection of said new furnace the said defendants, Brooke and Robeson, pretending that they have a right under said reservation to take as much ore as they can use in supplying a furnace of any size, have taken away a large quantity of ore in excess of what they are entitled to take, and that the books, papers and accounts of said defendants will enable them to state an account of the same. That said defendants, Brooke and Robeson, had built a second furnace, and claimed to take ore under said reservation for the supply of both; using one, however, when the other was out of blast, so that the consumption of ore should be continuous, and that the consumption of ore is less when there have to be suspensions for repairs; that such suspensions have always been known to be necessary, and were so especially in 1786, and necessarily entered into the estimate of the measure of an ore-right for the supply of one furnace, and that the defendants Brooke and Robeson have under their control books and papers which will show how often and how long have been the ordinary suspensions at the old Reading furnace for repairs which are usual and indispensable. That said defendants, Brooke and Robeson, under a pretended claim of right, by virtue of said reservation, have carried away ore from the Cornwall ore-banks and sold the same, and that the books and accounts will show how much.

[Alden's Appeal.]

The bill prayed: 1. Discovery of the amount of ore used at the old Reading furnace, of the amount necessary for the supply of the new furnaces built by the defendants Brooke and Robeson, and of the amount used in the same and of the quantity sold. 2. That the extent of the right reserved under the deed of May 9th 1786, be defined, and that the defendants Brooke and Robeson be decreed to have under said reservation a right to take ore for the supply of a furnace not exceeding such quantity as was used for the supply of the Reading furnace by George Ege, or for the supply of one furnace at the date of the reservation, and that they be restrained from selling any ore taken under said reservation, and from taking more than by the decree of the court they may be entitled to take for the supply of such furnace as the court may decide they are entitled to supply. 3. That an account be taken of all ore unlawfully taken away, used, sold or consumed otherwise than the said defendants are lawfully entitled to take and use. 4. General relief.

The answer of the defendants, Brooke and Robeson, averred:—

That on May 9th 1786, Peter Grubb, Jr., conveyed all his one undivided sixth part of the Cornwall Furnace estate, including the Cornwall Ore Banks, to Robert Coleman, and thereby ceased to be the owner of any furnace. That by the saving and exception in said deed there remained in Peter Grubb an estate in the premises conveyed, "which was a right in gross, or at large, neither appendant nor appurtenant to lands, but annexed to the grantor's person, to him, his heirs and assigns for ever; * * * that neither the deed nor the reservation required that Peter Grubb, his heirs or assigns, should become the owner of a furnace to enjoy it;" and that the measure of the quantity of ore which could be taken under it was the capacity of any furnace to be elected as a measure, and that such election was not to be made once, but at all times as often as the owners of the ore-right chose to make an election. That at the date of the reservation furnaces were known to be of different sizes and capacity, and it was well understood that they might be improved, both in their construction and mode of blowing, so as to increase the quantity of iron made and ore consumed. That after the execution of the deed of May 9th 1786, Peter Grubb supplied ore to the Berkshire Furnace (situated six miles east of the place where the Reading furnace was afterwards built), under an arrangement with the owner or owners of said furnace; that on May 1st 1788, he conveyed the ore-right to George Ege, who erected the Reading furnace, and supplied it with ore under the ore-right, but did not elect it as a measure of the right, nor make the right appendant or appurtenant to it. That the defendants (Brooke and Robeson) have become owners of the ore-right and also of the Reading furnace estate; that they have erected thereon a larger furnace, using anthracite coal and furnished with hot blast; and that furnaces as now constructed require more ore and produce

more iron than either of the furnaces owned by Robert Coleman on May 9th 1786. That the defendants have the right from time to time to elect any one furnace as the measure of the ore-right, and to use the ore as they please ; that they have not at any time taken from the ore banks more than sufficient for the supply of such furnace, although they have made sales of part of that quantity ; that they have taken less in any one year than the quantity to which they were entitled, and they claim the right to take so as to make up the deficiency ; and that for the supply of a furnace of approved construction, which they for the present elect as the measure of quantity, twenty thousand tons of ore are yearly required. That frequently ore fit to use has been exhausted at particular places ; that as the mining becomes deeper the quality of the ore deteriorates, and that the owners of the ore bank have sold ore contrary to an agreement between themselves, and that from these causes the " paramount estate vested in these defendants " is seriously impaired. That it was agreed by Robert Coleman, in his lifetime, and the owners of the ore-right, that the latter might take as much ore as they pleased from their own mine-holes. That it is true that the Reading furnace was a cold-blast charcoal furnace, worked by water-power. That they are not informed and cannot answer whether the utmost capacity of the said furnace as used by George Ege was fifty tons per week ; but neither Ege nor the defendants ever took from the said ore banks the full quantity to which they are entitled, and defendants claim the right to make up the deficiency. Defendants admit that on the 9th of May 1786 cold-blast charcoal furnaces alone were used in Pennsylvania, but deny that the greatest average capacity of such furnaces was twenty tons of iron per week, or that it was believed to be impossible to produce a greater quantity. They admit that it takes about two tons of Cornwall ore to make one ton of metal. That since May 9th 1786, the construction of furnaces has been improved by enlarged boshes and increased height and by the hot blast ; that the use of anthracite coal has been introduced, so that now, and for many years past, a much greater quantity of ore is required for a furnace than on the 9th of May 1786 ; and the defendants claim as the measure of their ore right a furnace of the best construction, and having the largest known capacity. That by reason of the better qualities of ore being exhausted by surface-mining, the use of anthracite coal and the hot-blast furnace had become a necessity to reduce the ore by reason of the increased quantity of sulphur and other foreign substances intermingled therewith. That by experiment it has been ascertained that a mixture of Cornwall ore greatly improves the quality of the iron ; that such mixture is necessary for salable iron, and that for the purpose of making such mixture, defendants claim the right to sell some or all of the Cornwall ore which they take for the supply of any one furnace of

[Alden's Appeal.]

the best construction. That the defendants have in their posses-
sion the books and accounts of the Reading furnace, but that the
same do not fix the extent of the ore-right reserved in the deed of
May 9th 1786. That it was never denied by Robert Coleman (the
elder) and his successors that furnaces might be improved from time
to time, or that the right of election under the ore-right extended
to such improved furnaces. That defendants have built upon the
Reading Furnace estate a new and improved furnace, of a capacity
of about one hundred and fifty tons per week, and they claim to
take ore sufficient for supplying a furnace of the best construc-
tion, and to use the same, or a portion thereof, at the furnace
which they have built.

The answers to the interrogatories in the bill aver: That the
Reading furnace was completed in 1793 by George Ege; that
before the completion of this furnace ore was taken under the
reservation and used at the Berkshire furnace. That they pulled
down the old furnace and erected a new one in 1845, but that
owing to the inferior quality of the ore obtained, it produced on
an average about the same amount of iron as the old one; that
they had commenced a new hot-blast furnace of a capacity of from
one hundred to one hundred and fifty tons a week; that they
had also sold some five thousand tons of ore; that it requires two
tons of Cornwall ore to make one ton of iron.

The answer of the defendants, who either represented or stood
in the place of the original defendants, Brooke and Robeson, was
filed in May 1873, and averred:

That the furnace commenced in 1854 was completed in 1858,
and, with the furnace rebuilt in 1845, was known as the "Robe-
sonia Furnaces."

That the one rebuilt in 1845 was called No. 1, the other No. 2,
and that all the ore used since the completion of No. 2 had been
used by it, except four thousand three hundred and seventy-seven
tons used at No. 1 when No. 2 was out of blast. The original
answer was adopted as part of this answer. The answer also aver-
red that there were charcoal furnaces producing from one hundred
to one hundred and twenty-five tons of metal per week.

After the answer of the defendants Brooke and Robeson had
been filed, the bill was amended by asking for relief in the alter-
native, should the court construe the reservation differently from
what the complainants had averred was its legal effect.

The amendment also denied certain pretences of the defendants
Brooke and Robeson, viz.: 1. That when they had taken less than
they were entitled to for one period, they could take more than
they would be entitled to in another period to make up the defi-
ciency of the former period. 2. That they could sell ore equal to
the amount of different ores which they mixed with Cornwall ore
they used. 3. That they could use the ore continuously by using

[Alden's Appeal.]

one furnace when another went out of blast. 4. That they could use the ore for the supply of a furnace of any capacity whatever. 5. That the right to take ore was without limit.

The answer of the defendants, Robert W. Coleman and William Coleman, and the answer of their successors and representatives, adopted substantially the averments of the bill, except so far as they set out the proportions in which the complainants and defendants owning the ore banks were entitled thereto, and joined in the prayers of the bill.

The case was referred to an examiner and master, Peter McCall, Esq., who reported the following facts as deduced from the testimony:

On the 26th of September 1785, articles of agreement were entered into between Peter Grubb, the younger, described as of the township of Heidelberg, in the county of Berks, iron-master, and Robert Coleman, of the township of Elizabeth, in the county of Lancaster, iron-master, by which Mr. Grubb, in consideration of 8500*l*. in gold or silver, lawful money of Pennsylvania, covenanted on or before the 1st of May then next, to grant and assure to Mr. Coleman all the estate which his father, Curtis Grubb, had conveyed to him by the above-mentioned deed, " except and specially reserving unto the said Peter Grubb, Jr., his heirs and assigns, the liberty of digging, raising, and hauling away a sufficient quantity of iron ore to supply the furnace which he purchased of John Patton, or any other furnace which he may erect elsewhere, provided there is not more than one furnace blowing at the same time."

It appears that in the interval the contract with Patton was annulled, for in 1790, Bridget Patton, the widow of John Patton, who took by survivorship the Berkshire furnace, conveyed it to George Ege.

On the 9th day of May 1786, Peter Grubb conveyed to Robert Coleman the hereditaments and premises which he had derived from his father, Curtis Grubb, " saving and excepting unto the said Peter Grubb, the grantor, his heirs and assigns for ever, the right, liberty and privilege, at all times hereafter, of entering upon the premises hereby granted and released, with his and their horses, carts, carriages and servants, and of digging, raising and hauling away a sufficient quantity of iron ore for the supply of any one furnace, at the election of the said Peter Grubb, his heirs or assigns, at all times hereafter, anything hereinbefore contained to the contrary thereof, in anywise, notwithstanding."

The sixth of the Cornwall ore banks and mine hills was not specifically named or mentioned in this deed, but passed under the general words of the grant: "All and singular other the lands, &c., &c., late the property of the said Curtis Grubb."

The deed contains a covenant for further assurance of the

premises, "saving and excepting always thereout, the right, liberty, and privilege hereinbefore reserved unto the said Peter Grubb, his heirs and assigns, of a sufficiency of iron ore for the use of one furnace for ever."

Mr. Grubb exercised this ore-right by supplying the Berkshire furnace, situated about four miles from the present Reading or Robesonia furnace.

On the 7th of May 1788, Peter Grubb, for the consideration of 3000*l.*, in gold and silver, granted to George Ege, his heirs and assigns, "all the right, liberty and privilege aforesaid, of him, the said Peter Grubb, his heirs and assigns, of entering, at all times hereafter, upon the premises aforesaid, with his and their horses and carts, carriages and servants, and of digging, raising and hauling away a sufficient quantity of iron ore for the supply of any one furnace, at the election of the said George Ege, his heirs or assigns, at all times hereafter."

Ege continued to use the ore from Cornwall at the Berkshire furnace until the completion of the Reading furnace, in 1793. From that time it was used to supply the Reading, now called the Robesonia furnace.

The furnace and ore-right, after various intermediate changes of ownership, became vested, in 1845, in Robeson, who afterwards conveyed one-half thereof to Brooke.

The average yield of furnaces in the region in which Cornwall is situated, built prior to 1800, did not exceed thirty tons a week; the maximum yield thirty-five tons. From 1800 to 1830, no furnace in the United States, or anywhere else, using charcoal as fuel, could have produced more than 1000 or 1200 tons of iron a year, while the average product of furnaces of the present day would be very nearly 200 tons per week.

From the statement of the account of ore taken from the Cornwall ore banks and mine hills to Robesonia furnace, it appears that in the year ending January 1st 1858, the quantity taken was 2081 tons. In the following year it went up to 10,314 tons. In the year 1868 it was 12,925 tons.

This great increase in the quantity of ore taken is mainly due to the use of steam instead of water-power, the introduction of anthracite coal as a fuel, the hot blast, and the use of three tuyeres instead of one. The mode of producing blast in this state in 1786 was by wooden bellows worked by water-power.

The steam-engine was first applied to driving blast in Pennsylvania about the year 1839. In England it had been used for that purpose long anterior to its use in this country. It was so used there shortly after its invention by Watt. His first patent was in 1769, although it was not until 1774 that he was able to produce any great practical results. The introduction of the steam-engine was a very important event in the manufacture of iron, as greater

[Alden's Appeal.]

volume and pressure of blast was obtained with steam than with water-power, and it possessed the great advantage of furnishing a uniform power, not affected by drought or freshets. The only fuel used in this state, and indeed in this country, in 1786, for the smelting of iron ore was charcoal. In England mineral coal has been generally used in blast-furnaces since the year 1750, but with us the use of charcoal as a fuel for furnaces continued up to 1839. The first anthracite used in Pennsylvania in making iron was at the Crane Works, in 1840.

The existence of coal in the Wyoming region was known as far back as 1766. Coal was known to exist at Pittsburgh as early as 1769. Charcoal furnaces went out of blast every autumn, and continued out of blast about three months, the miners becoming wood-choppers in the winter in order to prepare fuel for the next season.

The blast in 1786 was the cold blast. Neilson's invention of the mode of heating the air before it passes into the furnace, called the hot blast, was patented in 1828. Only one tuyere, or opening for the introduction of air into the furnace, was in use in this state in 1786. In the making of iron in this state with the old charcoal furnace, only one tuyere was used. Mr. Forney tells us he never saw two tuyeres used until 1838.

Besides those more important improvements which constitute epochs in the history of iron manufacture, there have been lesser improvements in machinery, greatly increasing the result, without reference to particular eras.

The defendants, the owners of the ore-right, had used iron ore in two furnaces, running one while the other was out of blast; and the amount they had used was largely in excess of the capacity of furnaces in 1786.

Upon these facts the master, inter alia, reported:

" On the whole I am of opinion, and so report, that the owners of the ore-right reserved by the deed of 9th May 1786, are not restricted to the quantity of ore used by Mr. Ege at the time he elected the Reading furnace; but that they have a right to a sufficient quantity of iron ore to supply any one furnace, from time to time to be selected by them, although of larger capacity than the Reading furnace elected by Mr. Ege, and using anthracite as fuel, the hot blast, and other modern improvements in the manufacture of iron, not known and in use at the time of the election of the Reading furnace.

" I am also of opinion, and so report, that they can use the ore taken under this ore-right in one furnace only elected by them, and not part of the time in one furnace and part of the time in another furnace, as they have done in No. 1 furnace, while No. 2 furnace was out of blast.

" The owners of the estate out of which the ore-right was

reserved, have a right to any benefit that may arise from the furnace elected being out of blast for purposes of repair or other cause.

"I further report, that under this ore-right they can use the ore taken by them only to supply the furnace elected by them, and that they have no right to sell or otherwise dispose of the ore."

Exceptions were filed to the master's report by Anne C. Alden et al., which the court dismissed, and confirmed the report of the master, Thayer, P. J., in an opinion, saying:

"After the most attentive consideration of everything that has been urged by the learned counsel against the correctness of the master's conclusions, we are unable to see that he could · have reached any other result than that at which he has arrived, consistently with the plain language of the deed of May 9th 1786, and the other evidence in the cause. We agree with him in both propositions upon which his report is based, viz: First, that the evidence shows that it was not the intention of the parties to limit the extent of the ore-right reserved, by the capacity of any particular furnace then existing, or by the capacity of furnaces made and used at the date of the reservation; and secondly, that the words, 'at all times hereafter,' in the second place in which they occur in the deed, refer to the right of selection of the furnace to be supplied, and not to the perpetual character of the reservation.

"In regard to the first proposition, without repeating the argument of the master, a few additional considerations may properly be mentioned in support of his conclusion. If it be true, as is assumed by the plaintiffs (we think without sufficient grounds to warrant it), that neither of the parties contemplated the great improvements which have been made in the smelting of iron and the operation of furnaces since the deed of 9th of May 1786, it would be manifestly inequitable (unless, indeed, the words of the deed require it, and present no other alternative) to put such a construction upon that instrument as would enable one of the parties to avail himself of these improvements while the other is precluded. If the plaintiffs may draw upon the ore banks, either for their own use or for sale to others, as they clearly may, to any extent rendered possible by the increased capacity of furnaces throughout the country, and the consequently greatly increased demand for the ore, and the defendants may not supply their one furnace according to the same increased capacity, it must be manifest that the right reserved by Peter Grubb is immensely diminished in value by those changes in the condition of the business which neither party is said to have foreseen. For that right will, by reason of the greatly increased quantity drawn from the ore banks, and consumed and sold by the plaintiffs in consequence of those improvements, be exhausted at a much earlier day than it

otherwise would be. This consideration, while it may amount to a hardship, is of course no answer to the plaintiff's claim, if that claim be supported by clear and unambiguous language in the deed. But if the words used do not necessarily lead to such a result, or if there be any ambiguity in the language used, it is a consideration of some weight in determining the true interpretation.

" But we agree with the master that on the face of the deed there is no ambiguity, that it neither indicates nor expresses an intention to fix the furnaces of that day as a certain and unvarying standard of quantity. The words of the reservation are ' the right of digging, raising and hauling away a sufficient quantity of iron ore for the supply of any *one* furnace at the election of the said Peter Grubb, his heirs or assigns, at all times hereafter.' It is not said in the deed ' any one furnace then built,' nor ' any one furnace of the capacity of furnaces as then made and used.' It would have been easy to have said this if this was intended. But the words are without any such limitation or qualification. The language used has a much broader sweep. It is ' any one furnace at the election of Peter Grubb, his heirs or assigns, at all times hereafter.'

" And this brings me to remark briefly upon the second proposition of the master, that these words ' at all times hereafter,' refer to the right of selecting the furnace to be supplied, and are not words introduced in this place to indicate the perpetual character of the reservation. As is pointed out by the master, the same words had already been used for that purpose in the previous part of the same sentence, and there was no occasion to use them again in another part of the sentence for the same purpose. They had already said, ' saving and excepting unto the said Peter Grubb, his heirs and assigns for ever, the right at all times hereafter of entering and digging, &c.' When the phrase ' at all times hereafter ' is used a second time in the same sentence, it is used after the words ' at the election of the said Peter Grubb, his heirs or assigns.' The phrase was plainly intended to qualify those words, and not to qualify over again the words in the remoter part of the sentence. Such a construction as that contended for by the plaintiffs, appears to us to be a construction at once unnatural, ungrammatical and arbitrary. Undoubtedly, words may be transposed if it be necessary to do so, in order to give effect to the evident intent of the parties. Parkhurst *v.* Smith, Willes 332, cited by the plaintiffs, is an instance of this ; and in our own reports Mutter's Estate, 2 Wright 314. But no rule of interpretation would justify us in transposing words to create an intent, which does not otherwise appear in the instrument, nor to destroy the natural sense which the words of the instrument and the connection in which they are used, plainly convey. We can see no warrant for taking

[Alden's Appeal.]

these words out of the position to which they have been assigned in the deed, by the parties themselves, and putting them somewhere else where they will mean something totally different, or where they would produce a meaningless tautology; nor any warrant for dropping them out of the deed entirely.    When the parties to this deed have said 'any one furnace at the election of the said Peter Grubb, his heirs or assigns, at all times hereafter,' we cannot see that they intended anything else than that which they have said, viz.: that Peter Grubb, and his heirs or assigns, should have the liberty of exercising that right of election at all times thereafter.

"Too much stress has, we think, been placed in the argument upon the use in the deed of the word 'election.'    The word in its technical signification means, an obligation imposed upon a party to choose between two inconsistent or alternative rights or claims, in cases where there is a clear intention of the person from whom he derives one, that he should not enjoy both.    It is of the nature of an election used in this sense that, when once made, it is final, and cannot be exercised again.    But the word is not used in any such technical sense in this deed, but rather in the sense of 'selection' or 'choice,' and in no other sense.    What the grantor, his heirs and assigns, are to do is, not to elect between two inconsistent rights (there is but one right), but to elect from time to time, the particular furnace with reference to which the right is to be exercised.    What was reserved, was a perpetual right to take from the ore banks a sufficient supply for 'any one furnace,' and a perpetual right to select from time to time the one furnace to be supplied.    It is as if the parties had said, 'the grantor excepts and reserves out of this grant to himself, his heirs and assigns for ever, the right at all times hereafter of entering, digging and hauling away, a sufficient quantity of iron ore for the supply of any one furnace, the said one furnace to be selected or designated by him, his heirs or assigns, at all times hereafter;' that is, from time to time hereafter, as often as their interest or wishes may lead them to select or designate the one furnace which is to be supplied.    'At all times hereafter' means, as often as the grantor, his heirs and assigns, may choose to exercise the right of designating the one furnace to be supplied.    These words are totally inconsistent with the proposition, that the right of designating the furnace to be supplied is exhausted by a single exercise of it.    Such a proposition cannot be successfully maintained, without striking these words out of the deed in the place where they stand, and so making a new contract for the parties, instead of the one which they made for themselves.    Looking at the whole deed, and at the particular words which are the subject of dispute, and gathering the intent from the natural sense of those words and the order in which they stand, we cannot see that any other meaning can, by any fair or legitimate method

[Alden's Appeal.]

of interpretation, be extracted from them, than that which the master has found in them ; and it is needless to add anything further upon this point to the reasons which he has assigned with so much perspicuity and force, in his report, for the conclusion at which he arrived.

" It is quite plain that the ore-right reserved cannot be used to supply two furnaces alternately, that is, that two furnaces cannot be operated at the same time, and the ore supplied alternately to the one or the other of them as one or the other of them may be out of blast.   The supply can only be taken for one furnace, and that furnace must be designated.   The designation may be changed from time to time, but not so as to enable the owners of the right to supply two furnaces alternately during the same general period of time, or so as to enable them to evade the restriction which is fastened upon the right.

" With regard to the ore sold by Robeson and Brooke, in 1855 and 1856, it does not appear from the master's report under what circumstances that ore was sold.   Whether it was surplus ore, remaining unused at the furnace, or ore sold directly from the banks ; it is perhaps immaterial, for as the defendants had no right to mine ore for the purpose of sale, neither could they sell what was mined for the supply of their furnace.   If any such supply remained on hand at any time unused by reason of the furnace being out of blast temporarily, it was their duty to have kept it on hand to go toward the supply of the furnace when work was resumed.   Otherwise it is clear that the quantity to be taken from the ore banks to keep up the supply of the furnace when in blast again, would be increased by just the quantity they had sold. They have thus taken not only a sufficient quantity to supply the furnace while running (which is the meaning of the reservation), but a certain other quantity which they have sold, and for this they must account.

" It was objected by the defendants' counsel on the argument, that, as it appears by the evidence, that one-sixth of the Cornwall ore banks and mine hills belong to Clement B. Grubb, and the heirs of Edward B. Grubb. as tenants in common with the Coleman family, that these persons ought to be made parties to the present proceedings. before any account is decreed.   Certainly they would be very proper parties to participate in the account which is to be taken partly for their benefit, but as no objection to their omission was taken by the defendants, either in their answer or by way of plea or demurrer, and as the defendants have not excepted to the master's report, upon this ground we must decline to delay a decree for this reason.   To do so would be to open afresh, and perhaps to commence again from the beginning, a litigation which has already endured for more than twenty years.

Therefore, let the decree reported by the master stand as the decree of this court."

It was also ordered that the case be referred back to the master to state the accounts and to report what sums, if any, are due by the defendants, or any of them, to the plaintiffs, or any of them, by reason of the taking of said ore.

In his supplemental report the master charged the estates respectively represented in appeals Nos. 109, 110 and 112 with the amount of ore unlawfully taken from the Cornwall banks, and with interest on the value of the ore from the time it was taken. Anne C. Alden and others excepted because the decree of the master was not in accordance with the prayer of the bill.

The parties in No. 111 excepted because the court had not allowed the defence of the Statute of Limitations to claims for ore sold during the lives of the decedents; because interest was allowed on the claims, and because they had charged for ore taken for one furnace while the other was out of blast. The parties in No. 112 also excepted for this last reason alone.

The court dismissed the exceptions and confirmed the master's report, whence this appeal.

*S. S. Hollingsworth, James L. Reynolds, George W. Biddle* and *F. W. Hughes,* for appellants, Anne C. Alden et al.—In regard to the extent of the reservation in the deed of May 9th 1786, the appellants contend that the intention of the parties thereto was to lay down a measure of quantity which should be fixed and determinate for all time to come, just as if speaking of agricultural products and the measure thereof, and that this fixed measure of what was to be taken annually *was the capacity of a furnace of the time in Pennsylvania,* that is at the time of the execution of the deed, the average furnace of that day in the United States, which went out of blast every autumn and produced about thirty tons of iron per week. Such furnaces were run by horse-power, and the blast was produced by wooden bellows which was applied through a single open tuyere. From the year 1800 to 1830 no furnaces in this country, using charcoal, could have produced more than from 1000 to 1200 tons of iron a year. The steam-engine was not applied to driving a blast in Pennsylvania until 1839, and anthracite coal was not used in the making of iron until 1840. Bituminous coal was not used until 1839. The hot-blast was not introduced into this country until about 1840. Manifestly it was a furnace of the capacity of existing furnaces, which was intended by the reservation in the articles of agreement. It was a right attached to and to be exercised in connection with a furnace just as the reservation in Grubb *v.* Grubb, 24 P. F. Smith 25, was a reservation attached to the Mount Hope furnace. It was to be exercised either at the John Patton furnace or some furnace to be

[Alden's Appeal.]

erected by Mr. Grubb. It is very clear, then, that when these articles were drawn, all that was intended was a reservation of a quantity of ore sufficient to supply such a furnace as they then knew in Pennsylvania, with iron ore sufficient to run it.

The change in the language of the reservation in the deed from that in the articles of agreement was to enable Grubb to use it without first building a furnace. In other words, the purchaser would be in the unfortunate position of having paid his money for a right to supply a furnace without owning the furnace which was to be supplied. Such a right, of course, would be unsaleable. It therefore became necessary to change, somewhat, the terms of the reservation, and to give a right for the supply of a furnace to be erected not only by Peter Grubb, but if he should die before he disposed of it, by his heirs, or if he should sell it, by his assigns. The language of the grant was accordingly altered so as to provide for the supply of a furnace to be erected by Peter Grubb, his heirs or assigns. It made no difference to Robert Coleman who selected the furnace, or where it was situated, provided the amount of ore taken was the same. It is impossible that any two intelligent business men would come together, and for a fixed sum of money which was just about a sum, the interest of which would pay at the then rate for the ore that a furnace of the then known capacity would use, agree that for this consideration ore might be taken for all time to come, the annual amount of which should be left dependent upon what the possible future growth of the art of manufacturing iron might be anywhere in the universe. If it is said that these intelligent iron-masters must have " believed in the certainty of progress, and that the furnaces of the future would consume more than the furnaces of that day did," we answer that while this is undoubtedly true, yet these men " did not and could not foresee the introduction of anthracite blast furnaces, nor of new means of easy transportation by steam-engines and railroads." That this is so has already been judically ascertained: see Coleman's Appeal, 12 P. F. Smith 276.

The machine now known as a furnace is a different thing from that in the contemplation of the parties, and cannot be included in the reservation because called by the same name: Bridge Proprietors v. Hoboken, 1 Wall. 116. In construing a deed containing an old reservation like this, all the circumstances under which the deed was made are to be considered in arriving at a correct interpretation: Sheppard's Touchstone 1, 86: Moorehead v. Snyder, 7 Casey 514; Connery v. Brooke, 23 P. F. Smith 80 ; Galloway v. Wilder, 26 Mich. 97 ; Clement v. Youngman, 4 Wright 341. When a man grants to another and his heirs a property, it does not require the superadded words *for ever* to show that this is a grant to endure as long as the estate itself can possibly endure.

[Alden's Appeal.]

When you once use the simple words of limitation, such as to a man and his heirs, any other words of addition, either to show those to whom he might sell or to show the duration of the estate are unnecessary, and therefore they are words of redundancy. The word *assigns* in this grant is a word of redundancy; the words *for ever* are words of redundancy. Of course the words "at all times hereafter" are equally redundant, whether found immediately after the words "right, liberty and privilege," or found in the latter part of the clause. It is said the effect of these words is to give a continuing right of election which may be exercised as often as the grantee or his heirs or assigns see fit. We contend they do not have that effect. They are appropriate words to give a single right of election to be exercised at any time in the future. They may have been intended to be read in connection with the words "supply for any one furnace," so that the deed would read "for the supply of any one furnace at all times hereafter at the election," &c. They were probably the mere verbiage of conveyancing. They are always found in grants of this kind: Mountjoy's Case, Anderson 307; Grubb *v.* Bayard, 2 Wall., Jr. 81; Gloninger *v.* Coal Co., 5 P. F. Smith 9; Clement *v.* Youngman, 4 Wright 341; Grubb *v.* Guilford, 4 Watts 223–5.

The ordinary rule is that the extent of the grant cannot be increased by an alteration or enlargement in the manner of using the thing granted. There are three classes of cases which are analogous to the present grant. They are grants of estovers for a house; of water for a mill, and of a way over land. You cannot alter the mill or house so as to use more wood or water, or use the way for a purpose other than that for which it was given: Cherrington *v.* Abney, 2 Vernon 646; Luttrell's Case, 4 Rep. 86; Allan *v.* Gomme, 11 Ad. & E. 759 (39 E. C. L. R. 215); Sharpe *v.* Hancock, 7 Man. & Gr. (49 E. C. L. R. 354); Viner's Abridgment, Grant H. 13; Wood *v.* Saunders, Law Rep. 10 Ch. Ap. 582; Johnson *v.* Rand, 6 N. H. 22; Carlisle *v.* Cooper, 6 C. E. Green 575; Wakerly *v.* Davidson, 26 N. Y. 327; Kirkham *v.* Sharp, 1 Whart. 323; Jameson *v.* McCredy, 5 W. & S. 129; Moore *v.* Schuylkill Nav. Co., 2 Whart. 477; Cress *v.* Varney, 5 Harris 496; Commmonwealth *v.* Erie and North-east Railroad Co., 3 Casey 339; Soohan *v.* City, 9 Id. 9.

The parties contracted in 1786 for a given sum, and if the right is to be increased because of the increased capacities of the furnaces of the present day, the grantor receives no additional compensation therefor. In Senhouse *v.* Christian, 1 T. R. 560; Dand *v.* Kingscote, 6 M. &. W. 174, and Bishop *v.* North, 11 Id. 418, cited by appellant, the right of way was incident to the enjoyment of something absolutely granted or owned, to wit, the coalmines reserved in Dand *v.* Kingscote or owned in Bishop *v.* North, within the parish referred to in the Act of Parliament. So that

[Alden's Appeal.]

the court was not deciding in either case the extent of the grant, but rather what passed as an incident to the sufficient enjoyment of the thing granted or owned.

These cases, if cited as they seem to be, as authority for the position that a grant of sufficient ore for a furnace can be increased by an enlargement of the furnace, are directly in conflict, not only with the English cases that have been cited before and since, but are absolutely irreconcilable with our own case of Morehead v. Snyder, 7 Casey 514.

A court of equity will enjoin the defendants from taking more ore than they are entitled to take, because the excess taken is a destruction *pro tanto* of the plaintiff's property. The jurisdiction of a court of equity to restrain waste or destructive trespass is well established in this state: Denny v. Brunson, 5 Casey 382; Bonaparte v. Camden and Atlantic Railroad Co., 1 Bald. 205; Jarden v. Philadelphia, Wilmington and Baltimore Railroad Co., 3 Whart. 502 ; Thomas v. Oakley, 18 Vesey 185; Unangst's Appeal, 5 P. F. Smith 128; Gass's Appeal, 23 Id. 39; Carey's Appeal, 25 Id. 201; Allison and Ervine's Appeal, 27 Id. 221. Apart from the character of the trespass, whether it amounts to the appropriation or destruction of the plaintiff's property or not, courts of equity will restrain continuing trespasses in order to prevent a multiplicity of suits: Scheetz's Appeal, 11 Casey 88; Masson's Appeal, 20 P. F. Smith 26. And will entertain jurisdiction of a case where, from the complication of the interests or the number of the parties, the remedy at law will not give adequate relief: Townsend v. Ash, 3 Atk. 337 ; Magic Ruffle Co. v. Elm City Co., 14 Blatch. 109 ; Walker v. Cheever, 35 N. H. 339.

*James E. Gowen*, for appellees.—The bill contains no averment of irreparable mischief or that there is no remedy at common law, and the case is not, therefore, within the equitable jurisdiction of this court: Grubb's Appeal, 9 Norris 228. The established rule of construction is, *quoties in verbis nulla est ambiguitas, ibi nulla expositio contra verba fienda est.* This is a cardinal canon of interpretation, both of deeds and statutes: Harvey v. Vandegrift, 8 Norris 346; Wusthoff v. Dracourt, 3 Watts 240 ; Hannum v. West Chester, 20 P. F. Smith 367. We contend there is no ambiguity in the language of the deed; no extrinsic evidence is needed to make it intelligible. Effect may be given to its every clause and word, and the intention of the parties must be sought for therein.

The parties to the deed were intelligent and practical iron men, and it is unreasonable to presume that they did not anticipate improvements in the production of ore and the manufacture of iron. If it was their intention that only a fixed quantity of ore should be taken why was not that certain quantity stated in the deed ? The

[Alden's Appeal.]

furnace to be supplied was "at the election of Grubb, his heirs and assigns."

If we assume that the preceding words taken by themselves indicate that the "any one furnace" was to be a furnace then existing, we here encounter the difficulty of understanding how the heirs or assigns of Peter Grubb were to elect in the future from the furnaces of the past.

If a right of election is given to A., his heirs or assigns, the heirs or assigns have the right to elect as well as A. True, the circumstances of the case may be such as to preclude more than one exercise of the right, whether by A., his heirs or his assigns, but the question now is, whether the furnace to be elected was to be a furnace of the year 1786, and the very fact that the election might be deferred for fifty years, shows that the parties to the deed did not mean to ·restrict the election to furnaces which, in the ordinary course of affairs, would have ceased to exist at the date of such postponed election.

And this right of election conferred upon Peter Grubb, his heirs and assigns, is to be exercisable "at all times hereafter." The appellants suggest many ways of accounting for the use of the words "at all times hereafter" in connection with the right of election all more or less ingenious—especially that which proposes to explain the. words by disregarding them. But the simplest way of explaining why certain words were used is, that the person using them meant to use them, and meant thereby to convey the idea which they express.

What right have we to suppose that he did not intend so to use them or to suppose that they were intended to carry a different meaning from that which they express? We have no authority to strike them out as the "verbiage of conveyancing," or to alter their collocation.

That the quantity to be taken should be "a sufficient quantity of iron ore for the supply of any one furnace;" and it is admitted that the right to take was to be a perpetual right. Do these words indicate that the idea which the parties endeavored to express was one of precise measurement of quantity, or one of perpetual and continuous supply? Did they refer to a furnace as·a recognised unvarying measure of quantity, equivalent to a fixed number ·of tons, or as a manufactory of iron requiring a supply of ore? If I, being about to erect a furnace, ask the owner of an ore mine to supply my furnace with ore, is he to understand that he is asked not to supply a furnace, but to furnish a fixed quantity of ore per year?

The rule *contra proferentem verba fortius accipiuntur* is never to be resorted to or relied upon except where all other rules of exposition fail: 2 Kent 556; Richardson *v.* Clements' Daily Leg. News, May 15th 1879; Baker *v.* McDowell, 3 W. & S. 360 ; Gib-

[Alden's Appeal.]

son *v.* Tyson, 53 N. Y. 44; Mather *v.* Chapman, 40 Conn. 382; Taylor *v.* Corporation of St. Helena, L. R., 6 Ch. 270.

It would be useless to comment upon the cases relating to estovers, ancient lights, rights of way, &c., which are cited in the appellants' brief. The extent to which easements, rights of common, or other privileges on the lands of the others, may be enjoyed, must vary with the terms of the grants by which they were created. It is not pretended that Peter Grubb might not have made the ore-consuming capacity of some one particular furnace, in its then condition, the measure of his ore-right, but it is denied that he did so.

*James E. Gowen,* for appellants, in Nos. 109, 110, and 112. These appellants have been charged with the value of ore consumed in the Robesonia furnace, No. 1, on several occasions when Robesonia furnace, No. 2, was out of blast.

They contend: That so long as the quantity taken did not exceed the measure prescribed in the reservation of the ore-right, the disposal of the ore was within their discretion. The measure was the quantity required to supply a furnace.

The right reserved by Peter Grubb was not an easement or a license, or privilege exercisable upon the land of another, but an estate itself in the land, and every presumption must be in favor of its unrestricted enjoyment.

The following authorities are referred to, as either directly or indirectly sustaining the appellant's claim to an unrestricted use of the ore taken by them under the contract: Luttrell's Case, *supra;* Hall *v.* Swift, 33 E. C. L. R. 382; Case *v.* Varney, *supra;* Tourtillot *v.* Phelps, 4 Gray 370; Biglow *v.* Battle, 18 Mass. 315; Wilson *v.* Stoeley, 4 McLean 275; Washburn on Easements 277; Haskins *v.* Haskins, 9 Gray 390; Stockbridge Iron Co. *v.* Hudson Iron Co., 107 Mass. 290; Phoenix Cotton Manufacturing Co. *v.* Hazen, 118 Id. 350.

Even if the ore must be used in an elected furnace, it can be used in a temporarily-elected furnace, during the temporary suspension of another furnace which had been elected and is intended to be elected again. If furnace No. 2 had been destroyed by fire or storm, could not the supply of ore have been immediately diverted to No. 1? If not, where would have been the right of election which was enjoyable at all times, and on what contingency would it have re-appeared? Would it have been absent, while its owners were doubting whether they would rebuild the ruined furnace, and have been restored to them when they had abandoned that idea? This would imply, that the right of election was not a continuous and ever-present right, and that a furnace could not be elected, if, at the time of its proposed election, the owners of the right had in view the election or re-election of some other furnace.

[Alden's Appeal.]

*James W. Paul*, for appellants in No. 111.—The lapse of time relieved appellants from all liability to account for the ore sold in 1856, and that used in furnace No. 1 before the 1st of March 1860. They were made parties to these proceedings more than six years after the deaths of the original defendants, and the account was carried back to a date more than eleven years before their being made parties.

This defence was, however, held to be unavailable, because their answer (filed May 21st 1873) to the last amended bill (February 15th 1873), did not suggest the bar of the Statute of Limitations. Under the circumstances of this case, it seems inequitable that the protracted and unaccountable delay of the plaintiff, should be visited upon the estates of decedents in the shape of such a heavy penalty. The appellants could hardly have been expected to take up the burthen of this litigation. Their interest in it was but incidental, and they certainly had reason to believe that the suit had been left to die. Representing as they did the interests of others, any attempt on their part to revive the suit, might have been considered impolitic and officious. The court, it is respectfully submitted, should not, in the exercise of their discretion, include interest as an element of damage for taking property, which was taken under the firm belief that a legal right was being exercised: Lykins Valley Coal Co. *v.* Dock, 12 P. F. Smith 236.

*S. S. Hollingsworth, James L. Reynolds, George W. Biddle* and *F. W. Hughes*, for appellees in Nos. 109, 110, 111 and 112.—One of the elements which enters into the question of how much ore it will take to supply a furnace, is the length of time the furnace must be out of blast in the ordinary course of business. At the time this reservation was made, charcoal furnaces, which were the only furnaces known in this country at that time (1786), "went out of blast every autumn, and continued out of blast about three months, the miners becoming wood-choppers in the winter in order to prepare fuel for the next season."

To have allowed the owner of the ore-right to supply a furnace located in some different region with ore during the winter months, would manifestly have increased the measure of the reservation, in a manner not within the contemplation of the parties.

No answer was made to the bill of revivor, until nearly six years after the personal representation of both Mr. Brooke and Mr. Robeson had been made parties; and even then, the objection of the lapse of time or bar of the statute, was not put forward, and from that time, 1873, until after the decree of the court in March 1878, no such objection was ever made. Such an acquiescence without making the objection, is a waiver of it: 2 Dan. Ch. Pr. 1542, notes 4 and 5; Jones *v.* Powell, 11 Beav. 398.

[Alden's Appeal.]

After waiting ten years and contesting the suit at every stage, it is too late, after the entry of a decree ordering them to account, to then attempt to evade the decree by setting up the Statute of Limitations. Going on with the case without making the objection, estops them from setting it up afterwards.

The action of trover is a proper remedy for an excess of ore taken under a reservation: Biglow v. Battle, 15 Mass. 315. In such an action, the measure of damages would be the value of the ore taken at the time when taken, with interest to the date of verdict.

In Parrott v. Ice Co., 46 N. Y. 461, Rapelyo, J., says, p. 369: "In cases of trover, interest on the value of the property is assessed by way of damages, for the purpose of complete indemnity of the party injured." Sedgwick on Dam., 6th ed., p. 491, note 3; Andrews v. Durant, 18 N. Y. 496.

Mr. Justice PAXSON delivered the opinion of the court, May 3d 1880.

The above appeals are all from the same decree. They may properly be discussed in one opinion, and will be considered in the order above stated.

ALDEN's APPEAL, No. 102. The underlying question in this, as well as the other appeals, is the proper construction of the reservation in the deed from Peter Grubb, Jr., to Robert Coleman. In this appeal the particular question is whether the appellees in whom are now vested the rights reserved by the said Peter Grubb, Jr., in said deed, are entitled to a full supply of ore for a modern furnace with all the recent improvements of the hot blast, the use of anthracite coal for fuel, of steam-engine for power, and with three tuyeres instead of one, or whether they are to be restricted to sufficient ore for the charcoal furnace as it existed at the time of the reservation? The question is important as it affects the parties for the reason that the modern furnace will make ten times as much iron as the old charcoal furnace with its cold blast admitted by a single tuyere, the uncertain power of water, and the certain blowing out of the furnace in the fall, to enable the men to chop wood and make charcoal in the winter.

The learned court below held, affirming the master, that the appellees were entitled to a supply of ore for a modern furnace; that they had a right to elect what furnace should be supplied, and that the right of election was not exhausted by its exercise upon a single occasion. In other words, they could change the furnace from time to time, as the exigencies of their business or their convenience might require. Both the master and the court below have so well vindicated their respective rulings upon this branch of the case that there remains little to add. We see no ambiguity in the reservation; nothing which extrinsic evidence is required, or

[Alden's Appeal.]

would be even permitted to explain. Where such is the case no more unsafe rule could be adopted than to search for a meaning of the parties that is not doubtful, and to write into their agreements matters which they have left out. It would have been very easy for Peter Grubb and Robert Coleman, when they contracted in 1786, to have placed a fixed limit upon this reservation. They were both iron-masters and men of intelligence, and knew, or must be presumed to have known, just what they were about. They could have limited the supply to a fixed number of tons, or knowing as they did the capacity of the furnaces of their day, they could have agreed that the annual consumption of one of them at that time should be the maximum beyond which the reservation should not go. It is no part of our duty to speculate as to why they did not limit the amount of ore by a fixed standard; it is enough for us to know that they have not done so, yet, if it were necessary, it would not be difficult to find excellent reasons why they adopted a shifting standard. We must assume that in contracting they mutually contemplated future improvements in the manufacture of iron, or else deny them average intelligence. Prior to 1785 a marked advance had been made in England. Then Smeaton's cylindrical blowing machine had already supplanted the rude wooden bellows, worked by water-power here up to and later than 1786. While it is true that the steam-engine was not applied to driving blast in Pennsylvania until 1839, yet it had been known in England many years before, and was in practical successful operation prior to 1785. So as to the use of mineral coal as fuel for making iron. It was not introduced here until 1839, but in England it had been used in blast furnaces since 1750. It may be that the great abundance and cheapness of wood in this country delayed for some time the introduction of mineral coal for such uses.

The reservation was of sufficient ore for one furnace at all times thereafter for ever. This was a perpetual reservation, or at least for so long a time as the ore banks should remain unexhausted. This reserved to Peter Grubb, his heirs and assigns, a certain interest in the ore in common with the owners of the ore banks. At the time of the reservation other furnaces were being operated, in the same manner as the Berkshire furnace, and using the ore in substantially similar quantities. The ownership of the Cornwall ore banks had since that time become further subdivided by death and conveyances. Other furnaces have been constructed and all are being operated with the modern improvements, and are using a corresponding increased amount of ore. To allow them to thus increase the consumption, and yet to confine the heirs or grantees of Peter Grubb to the quantity consumed in the old charcoal furnace of 1786, would be a forced and arbitrary construction of the reservation, and instead of carrying out the probable inten-

[Alden's Appeal.]

tion of the parties would, in our opinion, be doing violence to any reasonable view of what they contemplated at the time.   It is but just to suppose they expected that Peter Grubb, his heirs and assigns, should operate this one furnace as other owners were operating theirs.   There was no essential difference at the time of the reservation.   Why should there be now ?   It was manifestly the intention that the reservation should be of a certain proportion of the ore.   By allowing to the appellees the same improvements in the manufacture of iron as are enjoyed by the appellants this proportion can be maintained, and it can be done in no other way. These furnaces may be compared to so many candles, all lighted and consuming this ore at the same time.   Peter Grubb's candle burns no faster than the others, and while this is the case the appellants have no just cause of complaint.   If the appellants may draw upon these ore banks without limit, with the use of all the modern improvements by means of which the manufacture of iron is so rapidly multiplied, and yet hold the grantees of this reservation to the supply of the antiquated charcoal furnace, it is manifest the reservation itself is immensely diminished in value, and it is only a question of time, depending upon the extent of the ore banks, when it will be entirely defeated.

We need not pursue this branch of the case further.   We are of opinion that the reservation gives the appellees the right to as much ore as will supply any one furnace to be selected by them, and that the right to select was not exhausted by its exercise in a single instance.   This appeal is not sustained.

FERGUSON'S APPEAL, No. 109, July Term, 1878.—This was an appeal by the executors of William R. White, deceased.   The learned court below held that under the reservation of said deed of May 9th 1786, from Grubb to Coleman, 1. That the appellants are only entitled to a supply of ore for one single furnace selected, and cannot, while such furnace is undergoing repairs, use it in another furnace; 2. That the appellants must use the ore in the furnace so selected, and have no right to sell the same, or any part thereof, and that for ore so used they were liable to account to the appellees.   A decree was accordingly made against Nathaniel Ferguson and the estate of the said William R. White, that they pay to the appellees the sum of $912.06, for ore used in Robesonia furnace No. 1, from June 5th 1867 to June 25th 1867, and a further decree against the same parties of $32,773.55 for ore used in Robesonia furnace, No. 1, from March 13th 1873, to May 24th 1874.   So far as the above decrees were for ore used in Robesonia furnace No. 1, while No. 2 was undergoing repairs, we think they are correct.   Regarding the words in the reservation " a sufficient supply of ore for any one furnace " as a measure of quantity, we must interpret them to mean so much ore, and no more, as a given

[Alden's Appeal.]

furnace would use in the course of a year, taking into consideration the wear and tear, and the necessity of its going out of blast for repairs at stated periods. No furnace can continue in blast for ever; hence when parties fix the capacity of a certain furnace as a measure of the quantity of ore, they must be presumed to have had in view the fact that every furnace must stop at times, not only for ordinary repairs, but for other accidents and contingencies to the business. The use of furnace No. 2 from time to time, pending repairs to No. 1, the selected furnace, was using more ore than any one furnace was capable of doing, and hence cannot be presumed to have been in the contemplation of the parties, as it certainly is not within the terms of the reservation. That portion of the decree, however, which charges the appellants with the ore used in Robesonia furnace No. 2 from December 31st 1873 to May 28th 1874 rests upon a different footing. During all of this last period, No. 1 was in repair, and could have been put in blast. That this was not done was due to the belief of the appellants, as we gather from the offer of evidence rejected by the master, that they had a right to use No. 1 instead of No. 2. That they had no such right is manifest. If, however, there has been an honest mistake here, the appellees have no right in equity to take advantage of it unless they can show they have been injured. They have not shown such injury. The appellants had the right to use the ore in No. 2; had they done so, the consumption of ore, according to the offer, would "have been much larger than was consumed in No. 1." It is true by using No. 1 for five months, it enabled the appellants to operate No. 2 just that much longer, without stopping for repairs, and to that extent, perhaps, the appellees may claim to have been injured. But this injury, if not within the rule *de minimis*, is capable of being defined in extent by the master, and may have been more than compensated by the lesser quantity of ore consumed by No. 1. The appellees must remember that they are appealing to the conscience of a chancellor, as well as seeking the enforcement of legal rights, and that before they can ask for a decree in their favor for this particular ore, they must show some equity which would make it unjust to withhold it. We are of opinion that the master ought to have heard and considered the evidence referred to in the seventh assignment of error, and to this extent we sustain this appeal. The right to sell ore will be considered in the next appeal.

Appeal of NATHANIEL FERGUSON et al., executors of William R. White, deceased, and of SARAH D. ROBESON, executrix of Henry P. Robeson, deceased, No. 110, July Term 1878.—This appeal raises two questions distinct from those already discussed, viz., 1. The right of the appellants, or owners of the ore-right, to sell or dispose of the ore so taken by them otherwise than in the supply

[Alden's Appeal.]

of the selected furnace, and 2. On behalf of the estate of said Henry P. Robeson, the liability to interest on the amount charged as the value of the ore taken between November 6th 1861 and March 31st 1862.

Upon the question of the sales of ore there is an obscurity as to the facts both in the history of the case and in the report of the master. Nor is any additional light thrown upon this subject in the opinion of the court. The learned judge says.: "With regard to the ore sold by Robeson and Brooke, in 1855 and 1856, it does not appear from the master's report under what circumstances that ore was sold; whether it was surplus ore remaining unused at the furnace or ore sold directly from the banks. It is perhaps immaterial, for as the defendants had no right to mine ore for the purpose of sale, neither could they sell what was mined for the supply of their furnace."

We do not assent to the broad proposition that the appellants had no right to sell ore under any circumstances. It is conceded they could not supply the elected furnace and at the same time sell additional ore from the banks. This would extend the reservation beyond its terms, and make it as broad as the grant itself. It would be using more ore than was requisite for the supply of one furnace. But the appellants claimed, and so aver in their answer, that a portion of the ore sold was to make up for the ores used by them from other mines, and the schedules in their answers give the data upon which this claim is founded. If, as they assert, ores from other mines were mixed with the Cornwall ores, and so used in their furnace to improve the quality of the iron, they would have a right to sell a corresponding amount of Cornwall ore. To illustrate: If the selected furnace consumed ten thousand tons of ore in any one year, all of which the appellants were entitled to take under the reservation, and it was found that a better quality of iron could be obtained by the mixture of twenty per cent., say two thousand tons of other ore, they would have a right to exchange that number of tons of Cornwall ore for such purpose, or to sell the same and with the proceeds purchase the same quantity of other ores. This results from two causes: 1. The right to take a full supply for the selected furnace, and 2. Their right of dominion or absolute property in the thing taken. The reservation of the ore-right was not necessarily connected with the use of the furnace, except so far as it is necessary to measure the quantity. The appellants are under no obligation to operate the furnace which they may select; they are entitled to select a furnace, and to sell to the proprietor thereof a sufficient supply from the Cornwall ore banks. They may not sell to different furnaces, nor more than a supply to the selected furnace, for that would exceed the reservation. But the ore when taken out under the reservation, and to the extent it authorizes, is as much the property of the appellants

[Alden's Appeal.]

as the ore remaining in the banks is the property of the appellees. To impose such a restraint upon the use and alienation of property as is here claimed by the appellees would require the clearest language in the deed. Yet there is not a word in that instrument to justify such a claim. The appellants have an absolute right of property in the ore the moment it is taken out of the banks, subject to the single qualification that it must pass through some one furnace to be selected by them for the purpose of measuring the quantity. It therefore becomes of the highest importance to know under what circumstances the ore in question was sold, and for this purpose the case must go back to the master. The master finds sales by Brooke and Robeson from the Cornwall ore banks of over six thousand tons. The answer avers the use by appellants of other ores at the Reading furnace of over one thousand tons. To this extent, at least, they were entitled to sell Cornwall ore. The claim of the appellants to make up the deficiencies of former years is not sustained. They cannot take in one year what they might have taken the previous year, but neglected to do so. The right, if not exercised, or only partially exercised, for any one year, is gone with the expiration of that year.

We are unable to see any sufficient reason why interest should not be charged against appellants upon whatever is found against them for excess of ore. They have sold it and received the money. For the purpose of complete indemnity the interest is as essential as the value itself. This point does not need elaboration. To the extent indicated this appeal is sustained.

Appeal of EDWARD BROOKE, et al., No. 111, July Term 1878; Appeal of WILLIAM R. WHITE, et al., No. 112, July Term 1878.— These appeals present but a single question not already disposed of. The appellants have interposed the Statute of Limitations. This bill was filed July 15 1856. The answer of Messrs. Robeson and Brooke was filed on the 15th of October of the same year. The former died March 8th 1860, the latter May 18th 1861. The appellants, the executor and executrix of said parties respectively, were not made parties to the bill until September 1867. This was more than six years after the death of their respective testators, and if the appellant had set up the statute by plea or answer when they were first brought in they would have had a stronger case. But they answered the amended bill in 1873, and did not suggest the bar of the statute. The record shows no step taken by the executors objecting to the revival of the suit on the ground of lapse of time. It is too late to do so now. These appeals are however sustained for other reasons sufficiently set forth in the other cases.

The question of jurisdiction alone remains. This is common to all the appeals. A motion to quash was made upon this ground,

[Alden's Appeal.]

and Grubb's Appeal, 9 Norris 228, was cited in support of said motion. We need not extend this already protracted opinion by a discussion of this question. The distinction between Grubb's Appeal and the case in hand is palpable. The motion is denied.

We have not considered it necessary to refer to the numerous authorities cited on either side. Few of them have any bearing upon the case. We have been led to our conclusions more from the terms of the reservation, and its surrounding circumstances, than from the authority of decided cases which are not in point.

This cause came on to be heard, and was argued by counsel at the last term of this court held in the city of Philadelphia, whereupon, May 3d 1880, it is ordered and adjudged that the decree be affirmed as to Anne C. Alden et al., appellants in No. 102, July Term 1878, and their appeal is dismissed as to them with costs, and that said decree be reversed as to Nathaniel Ferguson et al., appellants in No. 109, July Term 1878; Nathaniel Ferguson et al., appellants in No. 110, July Term 1878; Edward Brooke et al., appellants in No. 111, July Term 1878, and William R. White et al., appellants in No. 112, July Term 1878, and that the record be remitted to the court below for further proceedings in accordance with the principles indicated in this opinion.

Justices GORDON and TRUNKEY dissented to the affirmance of Alden's Appeal.