## ARTEMAS DRYDEN Junior *versus* JOHN JEPHERSON.
## JOHN JEPHERSON *versus* ARTEMAS DRYDEN Junior.

D , the owner of a tract of land and two mill privileges, conveyed to M. a portion of the land, with a mill privilege, described in the deed by metes and bounds, " together with the privilege of a dam below D.'s factory and flowing the water as high as will answer and not injure or obstruct the water wheels of D. above." It was *held,* that this was a grant to M. of a right to build a dam for a mill privilege, and if, for the purpose of raising the water to the height agreed upon, it was necessary for M. to extend his dam over a part of the tract not included by such metes and bounds, he was authorized to do so, by the grant ; that evidence of acts done by the parties under a mutual agreement, immediately after the grant was made, by way of marking out the site and height of the dam to be erected by M., was competent for the purpose of determining the extent of the grant ; and that M. might maintain trespass *quare clausum* against D. for cutting through that portion of the dam which was placed upon the land not included by the metes and bounds, the interest of M. therein being a right of possession for the purpose of the dam, so long as his mill should continue, and not a mere easement.

THE first of these actions was trespass on the case, for flowing back water upon Dryden's mills by a dam, and for damage alleged to have been done to the lands of Dryden below the rolling dam, by the water flowing over the same. The writ was dated November 23d, 1835.

At the trial, before *Putnam* J., it appeared, that on March 15th, 1825, Dryden, having become the owner of the whole of the estate now occupied by him and Jepherson, conveyed to Daniel Morse two acres and three quarters of an acre of the land, more or less, and the house and other buildings standing thereon, with a water privilege, the same being described in the deed by metes and bounds, " together with the privilege of a dam below said Dryden's factory and flowing the water as high as will answer and not injure or obstruct the water wheels of said Dryden's, above." There were other stipulations in the deed respecting the use of the water, limiting the grantee's right to the ordinary flow of the stream, exclusive of showers, freshets and thaws, and providing that, if the grantor should withhold or refuse to let the water down, the grantee should " have free access to the gate at the head of the canal, and draw and convey the water in the canal to his works below." The grantor covenanted, that the premises were free from

incumbrance, " reserving the privilege as usual for Peter Hubbard to convey the water in a ditch into his interval below, forever."

In regard to this reservation, it appeared, that, in the deed under which Dryden derived his title, there was a reservation to Hubbard of " liberty to raise the water, where there is a mud sill now laid for that use, to water his mowing land."

Jepherson was now the owner of the water privilege conveyed to Morse.

Before the erection of Morse's dam, which took place in 1825, the water did not flow back upon Dryden's wheels, when there was no intervening obstruction, but afterwards it did flow back upon them six or seven inches. When Morse's dam was built, Dryden and Morse were present, and mutually agreed upon its height and length, and where it should be placed, and where the rolling part of the dam should be, and upon the length of that part. A small portion of the rolling part of the dam extended southerly upon the land of Dryden, beyond the line of the land conveyed by him to Morse, but the dam was built to the height and extent, and on the site marked out under the direction of Dryden and Morse ; and Dryden recommended, that the diameter of the wheel at Morse's mill should not be less than thirteen feet.

When Hubbard put up his dam, which was placed between the dams of Dryden and Jepherson, occasionally to drive the water into the ditch referred to in the deed from Dryden to Morse, for the purpose of irrigation, the water flowed back upon Dryden's saw-mill wheels six or seven inches. Morse's dam was to be of a height sufficient to raise the water in his pond as high as it was raised by Hubbard in his trench, for irrigation ; and Dryden was satisfied with Morse's dam after it was finished.

Morse offered to dig away the land below the rolling dam, in order to make a water-course through the southerly part of Dryden's land below the dam, but Dryden did not desire him to do so, saying that the water would cut its own channel through his land.

After the dam was built, Morse complained that he had not so good a privilege as he expected, and that Dryden had im

oosed upon him ; and the matter having been referred to one Lees, Dryden then said, that if the dam should flow his wheels, he was willing to have them raised. Dryden then contemplated building a factory on the upper privilege. Afterwards, Dryden's tub-wheel was, by his request, raised, at the expense of Morse, from twelve to eighteen inches, leaving the bottom of it three inches above the level of Morse's pond.

The second action was trespass *quare clausum fregit*, biought by Jepherson against Dryden.

It appeared, that on October 23d, 1835, Dryden gave Jepherson notice to lower his dam ; and that in consequence of Jepherson's not complying with the terms of the notice, Dryden cut a new water-course from Jepherson's pond into Dryden's own land, whereby the pond was lowered sixteen inches ; and the privilege became inadequate for a wheel of thirteen feet in diameter. The second action was brought to recover for this injury.

The judge directed that a verdict should be rendered for Jepherson, in both actions, subject to the opinion of the whole Court.

*Barton*, of counsel for Dryden, to the point, that if the acts of Dryden should be construed as a license operating to excuse the acts complained of in the first action, such license was executory and so revocable as to future purposes, cited *Cook* v. *Stearns*, 11 Mass. R. 533 ; *Whitney* v. *Holmes*, 15 Mass. R. 152 ; *Francis* v. *Boston and Roxbury Mill Corp.* 4 Pick. 365 ; *Gilmore* v. *Wilbur*, 12 Pick. 120 ; 1 Chitty's Gen. Pr. 338, and cases cited.

*Oct 6th*

*C. Allen* and *Washburn*, for Jepherson, to the point, that this was an executed license, and therefore irrevocable unless the licensee was indemnified for the expenses incurred by him 'n relation thereto, cited *Winter* v. *Brockwell*, 8 East, 308 ; *Hewlins* v. *Shippam*, 5 Barn. & Cressw. 221 ; *Francis* v. *Boston and Roxbury Mill Corp.* 4 Pick. 365 ; that after the dam was erected with the consent and under the direction of Dryden, it was purchased by Jepherson in reference to .he existing state of things, and Dryden was estopped to say, that his own privilege was injured thereby, *Wallis* v. *Truesdell*, 6 Pick. 457 ; *Nichols* v. *Arnold*, 8 Pick. 175 ; that evidence of

Dryden
*v.*
Jepherson.

acts done by the parties under a mutual agreement, immediately after the grant was made, by way of marking out the site and height of the dam, was competent for the purpose of determining the extent of the grant, *Makepeace* v. *Bancroft*, 12 Mass. R. 472 ; *Davis* v. *Rainsford*, 17 Mass. R. 211 ; *Allen* v. *Bates*, 6 Pick. 460 ; *Boynton* v. *Rees*, 8 Pick. 332 ; *Waterman* v. *Johnson*, 13 Pick. 267 ; *Neale* v. *Parkin*, 1 Esp. R. 229 ; *Ricker* v. *Kelly*, 1 Greenl. 117 ; and that the action of trespass *quare clausum* was rightly brought, *Wilson* v *Smith*, 10 Wendell, 324 ; *White* v. *Moseley*, 8 Pick. 356 ; *Clap* v. *Draper*, 4 Mass. R. 266.

*Oct. 12th.*

SHAW C. J. delivered the opinion of the Court. The first action is case, and alleges two distinct grounds of complaint, both arising from a dam and pond of water, upheld and used by the defendant for mill purposes ; one, in throwing backwater upon the plaintiff's mills, and the other, in discharging water at the defendant's waste way, or rolling dam, in such a manner as to flood a portion of the plaintiff's meadow.

The title of the whole estate occupied both by the plaintiff and the defendant, is traced down to the plaintiff, and it is conceded that the plaintiff owned the whole of that estate, consisting of what may be called for distinction a lower and an upper mill privilege, until the middle of March 1825, at which time he made a conveyance of the lower privilege to one Morse ; and it is conceded, that the defendant now holds all the estate which was then conveyed by the plaintiff to Morse. It becomes, then, necessary to examine that conveyance, and the situation and circumstances of the estate at the time of the conveyance, and the acts of the parties, and ascertain what were the rights acquired by Morse under that conveyance. This deed alludes to a reservation in behalf of one Hubbard, of a right to keep up a dam on the premises now occupied by the defendant ; but as the defendant has no controversy with Hubbard, no further notice need be taken of this reservation. But a reference to Hubbard's dam may be useful for another purpose. It was proved, that the plaintiff consented and agreed by parol, that Morse's dam might be so erected as to raise the water as high as it had been formerly raised by Hubbard's dam for irrigation ; but as it was conceded, that after

the dam built by Morse and now occupied by the defendant, was finished, the plaintiff was satisfied with it, it most fully establishes the fact otherwise stated in the report, that the dam, of the length, height, position and dimensions, as built by Morse, sold by him to the defendant, and since occupied by the defendant, was so built, with the knowledge and consent, and by the agreement and direction of the plaintiff. But as no right or interest in real estate can be conveyed by parol grant or agreement, however express and deliberate, it is contended that this agreement is unavailing ; and the defendant, in answer to the objection, relies upon two grounds ;

1. That the right to keep up and maintain the dam at its present height, was granted by the conveyance of the plaintiff to Morse ; and

2. That all the acts complained of were done by license of the plaintiff himself to Morse, and that the acts were of such a nature, that a parol license operated as a legal excuse for them.

The first question is upon the terms and legal effect of the conveyance. By this deed Dryden conveyed to Morse in fee, a tract of land, with a house and other buildings standing thereon, estimated at two acres and three quarters ; and it then proceeds to describe the land by metes and bounds ; the deed then adds, " together with the privilege of a dam below said Dryden's factory, and flowing the water, as high as will answer and not injure or obstruct the water wheels of said Dryden's, above." There are then stipulations respecting the use of the waters, limiting the grantee's right to the natural and ordinary flow of the stream, exclusive of showers, freshets and thaws, and providing that if the grantor should refuse or neglect to let the water down, the grantee should have the right to go upon the grantor's premises and open the gate. In the first place, it was contended by the grantor, that here was but one substantive grant, that of the land, and that the mill privilege is merely an incident, and that in consequence the grantee took no other privilege, than that which could be created on the land granted. . But we think that this is not the true construction. Upon this view of the grant, the words above cited would be wholly nugatory, inasmuch as the grantee of land would have a right to all the privi-

Dryden<br><em>v.</em><br>Jepherson.

leges which could be obtained on the land itself, without those words of grant. But the true intent of the deed appears to have been, to grant a privilege of building and maintaining a dam for a mill privilege, and if this purpose involved the necessity of using a portion of the grantor's land, to build the dam upon, it is necessarily a grant of the use of such land.

Taking this deed then to convey a distinct substantive right to erect a dam, and of course to flow the water to be raised by that dam, the question is, what was the extent and limit of that right, or in other words, to what height did the grantee acquire a right to raise the dam and to flow the water. The words are uncertain and indefinite. It is in terms the privilege of a dam and flowing the water as high as will answer, and not impair or obstruct the water wheels of Dryden's mill above. This description refers to facts not expressed in any part of the deed, and which cannot be inferred from any thing contained in it, and therefore, of necessity, warrants the admission of evidence *aliunde*. Parol evidence becomes necessary to show how high a dam could be raised, in the place designated, without injuring the grantor's mill wheels above, and also to ascertain what would be the height of a dam necessary to answer the object contemplated by the erection of it. This object is not expressed ; but as every grant made upon a valuable consideration must be presumed to be intended to be beneficial to the grantee, we must understand from these words, and the general tenor of the deed, that a useful privilege for mill purposes was intended. Compelled thus to resort to extrinsic evidence, to understand the terms of description used by the parties, we think that the evidence of what the parties did, by way of fixing limits to this grant, immediately after the grant was made, was competent, and it brings the case within that class of cases, in which it has been decided, that where parties to a deed, soon after its execution, in good faith and by mutual consent, place monuments to correspond with the deed, this act is taken to fix those monuments, and to define the limits of the grant. *Makepeace* v. *Bancroft*, 12 Mass. R. 472 ; *Davis* v. *Rainsford*, 17 Mass. R. 211 ; *Allen* v. *Bates*, 6 Pick. 460 ; *Waterman* v. *Johnson*, 13 Pick. 267. So it has been held, that a grant of a right to erect a dam within certain limits, becomes

certain, when the dam is built at a certain place within those limits, by mutual consent.  *Boynton* v. *Rees*, 8 Pick. 332.
· Taking this principle to be clear, and to be applicable to the present case, the evidence is conclusive to show, that soon after the grant, and with reference to it, the parties met and by mutual agreement, fixed upon the place of a dam, of a certain height and extent, as and for the dam, which the grantee had a right to build, by the terms of the grant.   The grantee was to make known to the grantor, what height of dam would " answer," that is, would answer the purpose contemplated and intended by him, which was one part of the description ; and the grantor would judge for himself and communicate to the grantee, what height of dam would be admissible, without obstructing his wheels above.   When, therefore, they agreed to a dam of given height and length, they, in effect, determined, what were the limits of the grant, as expressed in the deed. That the parties intended thus to fix and define the limits of the right granted, is expressly found by the case, and the only question is, whether this intent, expressed by parol agreement and acts *in pais*, can be carried into effect, or whether this would be a violation of the rule of law, requiring all rights and interests in real estate to be manifested by some writing.   We think it may be carried into effect without any violation of the rule in question.   It is the common case of going into evidence *aliunde* to ascertain limits and monuments, left uncertain in the description ; it identifies the subject intended by the deed, and then the right or estate passes, by the operation of the deed.   The Court are, therefore, of opinion, that the defendant, Jepherson, did not exceed the right granted to his predecessor, Morse, by the plaintiff, and that this action cannot be maintained.

There is another action depending upon tne same facts brought by Jepherson against Dryden.   It is *trespass quare clausum fregit*, and brought for cutting through the plaintiff's dam, and letting off the water.   It was contended, that even if the plaintiff had any legal remedy, it must be sought in an action of the case, and that trespass would not lie.   It was left in a little doubt by the case as reported, whether the digging complained of, was around the end of the dam, on the defend

Dryden
*v.*
Jepherson.

ant's own land, or whether the cut was through the body of the dam, but it was conceded at the argument, that the cut was through the body of the dam. Still the defendant insists, that the cut was through that part of the dam, which was built on his own land, and, therefore, that the only injury was in letting off the water and not in breaking the plaintiff's close. It appears, that the cut was through that part of the dam, which was beyond the limits of the land granted by metes and bounds, but it was necessary thus to extend it over the grantor's land, in order to raise the water to the height agreed upon, as before stated. Upon the grounds before stated, the Court are of opinion, that the grant of the right to build a dam, of a given height and extent, was a grant or demise of so much of the grantor's land, as it would be necessary to occupy by such dam. Suppose a man, owning land on both sides of a stream not navigable, should grant to another the land on one side, bounded by the thread of the stream, and should, at the same time, grant a right to erect a mill on his own land, with a dam of sufficient height to raise water to drive such mill. As such dam could not raise the water, without being extended across the river, and, of course, one half upon the grantor's own land, such a grant would, by necessary implication, carry the right to build that part on the grantor's own land, and to occupy it as far as necessary to maintain the dam, so long as the dam should be kept up. This is similar ; it is a grant to use and occupy the grantor's land for the purpose of a dam so long as the dam is kept up. This is not a mere easement, but is to be deemed a freehold determinable upon the cessation of the mills, or as a demise, for the time the mills should continue. Such an interest is not a mere easement, but carries the right of possession, for a violation of which this action lies.

*Judgment for Jepherson, in both actions.*