# Robert Hogg, Jr., Appellant, *v.* William Bailey and Taylor Hoffman.

*Ancient deeds and grants—Construction—Usage.*

Ancient words, grants, deeds and charters will be interpreted by usage.

However general the words of an ancient grant may be, it is to be construed by evidence of the manner in which the thing granted has always been possessed and used; for so the parties thereto must be supposed to have intended.

*Indefinite easement—Evidence of exhaustion—Acts of original parties.*

Where there has been a grant in general terms to erect a dam and back up waters on grantor's land as much as the grantee may think necessary, and where the election has been made and the location and height of the dam determined at the time so as to fix the back flow of the water to the extreme limit and to a definite point immediately after the execution of the grant, and uninterruptedly continued for fifty years it must be held as a matter of law that the right or privilege under the grant is exhausted by these acts of the parties as the best evidence of their intention.

Argued May 10, 1897. Appeal, No. 39, April Term, 1897, by plaintiff, from judgment of C. P. Butler Co., Sept. T., 1895, No. 51, on verdict for defendant. Before RICE, P. J., WILLARD, WICKHAM, BEAVER, REEDER and ORLADY, JJ. Reversed.

Trespass for damages resulting from raising of a mill dam. Before GREER, P. J.

The facts sufficiently appear in the opinion of the court.

Verdict and judgment for defendants for costs. Plaintiff appealed.

*Errors assigned* among others were: (3) In refusing plaintiff's third point, which point and answer are as follows: " 3. The agreement offered in evidence on part of the defendants contemplated but one fixing of the height and one election only, and Floyd having built a dam fifty years prior to the bringing of this suit, he exercised his judgment, made his election and exhausted the grant, and the defendants (successors in title to Floyd) could not raise the dam in 1894 so as to flow more of the grantor's land. *Answer:* Refused. (4) In refusing plaintiff's fourth point, which point and answer are as follows: "4. Robert Hogg, Sr., and Thomas Floyd, at the time the contract dated April 12, 1837, was made, contracted for the height that was to be given to the dam which was then in contemplation, and not for any height that might be desired in any undefined future time, and the price was set according to the value of the land then, and not what it might be in 1894. *Answer:* Refused." (5) In refusing plaintiff's fifth point, which point and answer are as follows: " 5. The agreement offered in evidence between Floyd and Hogg, Sr., did not mean that Thomas Floyd, or those holding under him, could increase the height of the dam beyond what it stood at for twenty-five years prior to the bringing of this suit. *Answer:* Refused." (14) In affirming defendants' sixth point, which point and answer are as follows: " 6. Under the pleadings and evidence in this case, the verdict should be for the defendants. *Answer:* Affirmed."

*Lev. McQuistion* of *McQuistion & Vanderlin,* for appellant.— The privilege of backing water on Hogg's land as much as the said Floyd may think necessary by a dam on said James Bovard

place, meant the construction of the dam in 1837 of such height as would be then reasonably necessary to operate Floyd's mill: Goodrich v. Israel, 67 Mass. 615; 70 Mass. 379; Lau v. Mumma, 43 Pa. 267; Mertz v. Dorney, 25 Pa. 519; Keller v. Stoltz, 71 Pa. 356.

*J. M. Thompson*, of *Thompson & Son*, with him *Ralston & Greer*, for appellees.—Although the plaintiff has filed fourteen assignments of error, they raise but a single question, and that is the proper construction of the' agreement, bearing date the 12th day of April, 1837.

To the position and citations of the plaintiff we present Alden's Appeal, 93 Pa. 182, as a conclusive answer.

The cases relied on by plaintiff are all cases founded upon and decided from principles applicable to title by the statute of limitations, and consequently are utterly inapplicable to the rule governing the construction of deeds.

OPINION BY ORLADY, J., July 23, 1897:

On April 12, 1837, Robert Hogg, Sr., being then the owner of a tract of land containing about two hundred and twenty acres, sold to Thomas Floyd, by an agreement in writing, for a consideration of $350, a certain piece or parcel thereof, described by courses and marks, containing about twenty-three acres on the waters of Slippery Rock creek, "being part of lot number 37, in the second district of donation lands on the waters of Slippery Rock creek, in Butler county, adjoining James Bovard and others, beginning at the southwest corner of said lot number 37, and running east to an allum tree on the bank of said creek, to embrace all the land in that distance on the south side of the creek, thence on the north side of said creek, beginning on James Bovard's line so far up said creek as to embrace a spring below where said Hogg is preparing to build; thence nearly a west course to said Bovard's line. Together with the privilege of backing water on said Hogg's land, as much as said Floyd may think necessary, by a dam on said James Bovard's place, and the parties above named do expressly agree that the said Hogg doth bind himself, his heirs, executors, administrators or assigns, to make unto the said Floyd, his heirs, executors, administrators or assigns, a good and sufficient title for the

above land in fee simple, at or upon the first day of June, 1842 ; and likewise, such other writings and assurances, if thought necessary for securing such water privilege." The deed for the property was not made by Robert Hogg, Sr., June 1, 1842. He died in 1858 and his executors on September 3 of the same year perfected the contract by delivering a proper deed for the land and water right described in the agreement, to Robert Floyd the assignee of Thomas Floyd, through whom the title to the land and water rights became subsequently vested in William Bailey and Taylor Hoffman, the appellees.

After the execution of the agreement in 1837, Thomas Floyd erected a gristmill on the property, and constructed a dam of the height of six feet, six inches in Slippery Rock creek, to furnish power therefor. This dam obstructed the natural flow of the water, so as to back it to the property line of an upper owner named McMurray, and has been continuously maintained as first located for the purpose of supplying power to the gristmill, and as claimed by the plaintiffs, had been of the same height as the original construction, until in 1894 when the present owners placed across its breast a piece of timber eight inches thick which the plaintiff claims, caused a greater volume of water to be retarded in its natural flow, and to be backed so as to overflow the banks of the stream and to destroy a private road, a spring, meadow land adjoining the creek and to cause other injuries. This action of trespass is brought to recover damages caused by raising the breast of the dam, higher than the original one. It was urged in support of the plaintiff's claim that the first construction in the creek was a full exercise and satisfaction of the right and that it exhausted defendant's power under the grant.

These propositions were submitted in a number of points on the trial, all of which were refused by the court, and the jury was instructed to return a verdict for the defendant.

The question is what was the extent of the privilege given in the words : " Together with the privilege of backing the water on said Hogg's land as much as the said Floyd may think necessary by a dam on said James Bovard's place, and the parties above named do expressly agree that the said Hogg is never to claim any other or greater damages for backing said water, than what is mentioned above . . . . " McMurray was a mill owner on the stream above, and the height of the dam in 1837

was fixed by the levels to the McMurray line, and the evidence shows the dam had been repaired a number of times.

The construction given to the agreement by the court below is based on Alden's App., 93 Pa. 182. The reservation in that case was " saving and excepting unto the said Peter Grubb the grantor his heirs and assigns forever, the right, liberty and privilege, at all times hereafter, of entering upon the premises hereby granted and released, with his and their horses and carts, carriages and servants, and of digging, raising and hauling away a sufficient quantity of iron ore, for the supply of any one furnace, at the election of the said Peter Grubb, his heirs or assigns, at all times hereafter, anything hereinbefore contained to the contrary thereof, in any wise, notwithstanding." The proceeding was one in equity, in which the owners of the undivided five sixths of the Cornwall ore banks and mine hills filed their bill against the owner under the reservation of the undivided one sixth, claiming that the amount of ore to which the owner, under this reservation was entitled, was the amount used by a furnace of the kind and character in operation in 1778 ; and that ore had been taken under this reservation, to supply a furnace using ten times that which was used by the original furnace ; and prayed for the discovery of the amount of ore used at the old furnace ; of the amount necessary for the supply of a new furnace ; of the amount used in the same, and the quantity sold ; that the defendants be decreed to have under said reservation, the right to take ore for the supply of the furnace, not exceeding such quantity as was used for the supply of the old furnace, or for the supply of one furnace at the date of reservation. The court below in affirming the report of the master says : " The evidence shows that it was not the intention of the parties to limit the extent of the ore right reserved, by the capacity of any particular furnace existing, or by the capacity of furnaces made and used at the date of reservation.

If it be true as is assumed by the plaintiffs, that neither of the parties contemplated the great improvements which have been made in the smelting of iron and the operation of furnaces since the date of May 9, 1786, it would be manifestly inequitable (unless, indeed, the words of the deed require it, and present no other alternative) to put such a construction upon that instrument, as it would enable one of the parties to avail

himself of all these improvements, while the other is precluded. If the plaintiffs may draw upon the ore banks, either for their own use or for sale to others as they clearly may, to any extent rendered possible by the increased capacity of furnaces throughout the country and the consequently greatly increased demands for the ore, and the defendants may not supply their one furnace according to the same increased capacity, it must be manifest that the right reserved by Peter Grubb is immensely diminished in value by those changes in the condition of the business which neither party is said to have foreseen. For that right will, by reason of the greatly increased quantity drawn from the ore banks, and consumed and sold by the plaintiffs in consequence of this improvement, be exhausted at a much earlier date than it otherwise would be. . . . It is not said in the deed 'any one furnace then built,' nor 'any one furnace of the capacity of furnaces then made and used.' It would have been easy to have said this, if this was intended but the words are without any such limitation or qualification. The language used is of much broader sweep. It is 'any one furnace at the election of Peter Grubb, his heirs or assigns at all times hereafter.' 'At all times hereafter' means as often as the grantor, his heirs, and assigns may choose to exercise the right of designating the one furnace to be supplied. These words are totally inconsistent with the proposition that the right of designating the furnace to be supplied is exhausted by a single exercise of it."

In dismissing the appeal which was taken to the Supreme Court it is said: "The reservation was of sufficient ore for one furnace at all times thereafter forever. This was a perpetual reservation, or at least for so long a time as the ore banks should remain unexhausted. This reserved to Peter Grubb his heirs and assigns, a certain interest in the ore in common with the owners of the ore banks. If the appellants may draw from these ore banks without limit, with the use of all the modern improvements, by means of which the manufacture of iron is so rapidly multiplied, and yet hold the grantees of this reservation to the supply of the antiquated charcoal furnaces, it is manifest the reservation itself is immensely diminished in value, and it is only a question of time, depending upon the extent of the ore banks, when it will be entirely defeated. We are of the opinion that the reservation gives the appellees the right to as

much ore as will supply any one furnace to be selected by them, and that the right to select was not exhausted by its exercise in a single instance."

This decision is to be taken in the light of the facts moving the court to make it, and it is a very different proposition from the one urged by the appellees in this case, who claim that under the agreement between Robert Hogg and Thomas Floyd, and the deed following it in 1858, the present owners have the right to construct and maintain a dam seven or seventy feet high, as against those claiming title under Robert Hogg, Sr. To this we cannot agree.

In Dryden v. Jepherson, 35 Mass. 385, it is held: "By this deed Dryden conveyed to Morse in fee a tract of land, with a house and other buildings standing thereon, estimated at two acres and three quarters. The deed then adds, 'together with the privilege of a dam below Dryden's factory, and flowing the water as high as will answer and not injure or obstruct the water wheels of said Dryden's above' of which the Supreme Court by the Chief Justice, says : 'Taking this deed then to convey a distinct substantial right to erect a dam, and of course to flow the water to be raised by that dam, the question is, what was the extent and limit of that right; or in other words, to what height did the grantee acquire the right to raise a dam and to flow the water? The words are uncertain and indefinite. This description refers to facts not expressed in any part of the deed, and which cannot be inferred from anything contained in it, and therefore, of necessity it warrants the admission of evidence aliunde. Compelled thus to resort to extrinsic evidence to understand the terms of description used by the parties, we think the evidence of what the parties did, by way of fixing the limits of the grant, immediately after the grant was made, was competent, and so brings the case within that class of cases in which it has been decided that where parties to a deed, soon after its execution, in good faith and by mutual consent, place monuments to correspond with the deed, this act is taken to fix those monuments, and to define the limits of the grant:" Makepeace v. Bancroft, 12 Mass. 469; Allen v. Bates, 23 Mass. 460; Waterman v. Johnson, 30 Mass. 261.

In Boynton v. Rees, 25 Mass. 329, " a grant of a right to erect a dam within certain limits becomes fixed when the dam

is fixed at a certain place within these limits by mutual consent." In Jennison v. Walker, 77 Mass. 423, where an easement—as a right to lay an aqueduct through land—is granted in general terms, without giving definite location or description to it, so that part of the land over which the right is to be exercised cannot be definitely ascertained, the grantee does not thereby acquire a right to use the servient estate without limitation as to the place or mode in which the easement is to be enjoyed. When the right granted has been once exercised in a fixed and definite course, with the full acquiescence and consent of both parties it cannot be changed at the pleasure of the grantee. If it be admitted that he has the right originally to select the place in which the easement is to be enjoyed, he cannot alter it. This rule rests on the principle that where the terms of the grant are general or indefinite, so that its construction is uncertain or ambiguous the acts of the parties contemporaneous with the grant and giving a practical construction to it, shall be deemed to be the just exposition of the intent of the parties. "Where uses, susceptible of variation or quantity are the foundation of a right the quantity of the enjoyment during twenty-one years during which the right is acquired will prescribe the limit of the quantity of the use, the right to which is asserted:" Trickett, Lim., sec. 134.

Under the agreement of 1837 Thomas Floyd had an undoubted right to locate a dam on any site he might select on James Bovard's place, of any height he might think necessary; and Robert Hogg or his successors in title, could not claim damages as against that construction; but the privilege of determining the location and height of the dam was a personal one to Thomas Floyd, and not to his heirs, executors, administrators or assigns, as shown by the words "together with the privilege of backing the water on said Hogg's land, as much as the said Floyd may think necessary, by a dam on said James Bovard's place," and the covenant "to make unto the said Floyd, his heirs, executors, administrators or assigns, a good and sufficient title for the above land in fee simple, and likewise such other writings and assurances, if thought necessary for securing such water privilege" could only refer to the privilege as elected and determined by Robert Hogg, who died prior to 1858, and did not, as in Alden's Appeal have a continuing

right, at all times thereafter as often as the grantor, his heirs and assigns might choose to exercise it.

" There is no better way of interpreting ancient words, or of construing ancient grants, deeds and charters, than by usage ; and the uniform course of modern authorities fully establishes the rule, that however general the words of an ancient grant may be, it is to be construed by evidence of the manner in which the thing granted has always been possessed and used ; for so the parties thereto must be supposed to have intended. Thus, if it be doubtful on the face of an instrument, whether a present demise or future letting was meant, the intention of the parties may be elucidated by the conduct they have pursued and where the words of the instrument are ambiguous, the court will call in aid acts done under it, as a clue to the intention : " Broom's Maxims, sec. 682.

" Where an easement is granted, to be exercised within certain limits, and the grantee openly exercises a privilege in excess of the limit, continuously and without interruption for twenty-one years, under claim of right, the law may presume a second grant, superadded to the first, covering the larger grant : " Gehman v. Erdman, 105 Pa. 371. Where the election has been made and the location and height of a dam determined at the time so as to fix the back flow of the water to the extreme limit, and to a definite point immediately after the execution of the grant, and uninterruptedly continued for fifty years, it must be held as a matter of law that the right or privilege under the agreement of 1837 and deed of 1858 is exhausted by these acts of the parties, as the best evidence of their intention.

The manner of the occupation of the premises by Floyd, in flowing back the water on portions of Robert Hogg's unsold land, would reasonably be the result of conference between the parties to that agreement, when the levels to the McMurray line fixed the height of the dam ; or if not the result of conference, the subsequent acts of Thomas Floyd, in fixing the dam at that height, and maintaining it for fifty years, was equivalent to a declaration by him at that time that no greater height would be asserted.

It is not contended, that the dam built in 1837 was not a completed structure—as high at its breast as Thomas Floyd intended it to be—it was a monument of his exercise at that time

of the "privilege of backing the water on said Hogg's land as much as the said Floyd may think necessary by a dam on James Bovard's place."

While the height of the dam was not limited by the agreement to feet and inches, his act in the exercise of his privilege is the best evidence of what he then thought necessary.

In Goodrich v. Longley, 70 Mass. 379, the main question was "as to what the defendants did in 1847, did they then in fact erect a four foot dam, if that was within their right?" and it was held that admitting that orders under which the workmen did the work were part of the acts, and gave character to them and so were admissible, the unexecuted purposes and intentions of the defendants were not material to any question before the jury." In this case the purpose to build was manifested in a completed dam, of the height which flowed the water to the extreme limit of Hogg's land—the McMurray line. The same proof of user which establishes the right, is equally conclusive in establishing the limitations of that right. This is the law as to easements acquired by prescription, and we see no good reason in this case for not applying the same rule, after an election has been made, in limiting the extent of an easement acquired by grant.

It was contended on the part of the defendant, that the height of the dam was not increased; that only the necessary repairs were applied and made from time to time to preserve the head of the water, which was secured and continuously used under the original construction and that the plaintiffs placed in the back water, stone and earth for fording purposes, which contributed to increasing the extent of the back water.

These are disputed questions of fact, which as they are resolved will determine the plaintiff's right to recover. The second, third, fourth, fifth, and fourteenth assignments of error are sustained, and this disposes of the others.

The judgment is reversed and a venire facias de novo is awarded.